## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: | In Proceedings |
| | Under Chapter 7 |
| ALAN LEE PRESSWOOD | |
| | Case No. 12-60237 |
| Debtor(s). | |

### OPINION

This matter is before the Court on Trustee Robert T. Bruegge's ("Trustee's") Application to Compromise the Chapter 7 Debtor's interest in a class action lawsuit and the Debtor's objection thereto. For the reasons discussed below, the Application is denied.

### FACTS

Debtor Alan Presswood ("Debtor") filed a Chapter 7 petition on May 29, 2012 and movant Robert T. Bruegge was appointed Trustee of the bankruptcy estate. At the time that the petition was filed, the Debtor did not schedule or otherwise disclose any pre-petition claims or causes of action in which he may have an interest.

On February 25, 2015, Alan Presswood, D.C., P.C.[1] filed a class action lawsuit against Pernix Therapeutics Holdings, Inc. ("Pernix") and other defendants in the Circuit Court of St. Louis County, Missouri (Case No.15SL-CC00687) based, *inter alia*, on alleged violations of the Telephone Consumer Protection Act of 1991 ("TCPA"). *See* 47 U.S.C. § 227. Specifically, the class action complaint alleges that in April 2011, Pernix sent two (2) unsolicited facsimiles to the Debtor in violation of the TCPA. Pernix subsequently removed the suit to the United States

---

[1] Alan Presswood, D.C., P.C. was originally identified as the named plaintiff in the TCPA suit. However, the Debtor has requested that the District Court substitute him as the named plaintiff due to the fact that he was actually operating his business as a sole proprietorship at the time that the alleged TCPA violations occurred. *See Debtor's Objection to Application to Compromise Controversy and Suggestions in Support Thereof* (Doc. #73) n. 2.

1

District Court for the Eastern District of Missouri (Case No.15-cv-00592-NAB) where it remains pending.[2] To date, the punitive class remains unidentified and uncertified.[3]

On June 25, 2015, the Debtor filed an amended Schedule B with this Court in which he valued his interest in the Pernix litigation at $500. The Court notes that this was the first time that the Debtor disclosed his interest in the pre-petition causes of action against Pernix, despite the fact that the class action suit had been pending for several months. In addition to the amended Schedule B, the Debtor also filed an amended Schedule C in which he claimed a $500 exemption in the Pernix causes of action pursuant to 735 ILCS 5/12-1001(b) (*See* Doc. #72).[4] The Trustee does not oppose this exemption.

On September 14, 2015, the Trustee filed the instant Application to Compromise the bankruptcy estate's claims against Pernix. The proposed settlement provides, in pertinent part:

> 3. Pernix shall pay the Trustee the sum of $10,000.00 USD (the "Settlement Payment") within twenty-one (21) days of the Order approving the [Rule] 9019 Motion.
>
> 4. Except with respect to the Parties' obligations set forth in this Settlement Agreement, upon the Trustee's receipt of the full amount of the Settlement Payment, the Trustee, in his capacity as the chapter 7 trustee for the bankruptcy estate of the Debtor, herby remise[s], release[s], discharge[s] and acquit[s] Pernix, and each of Pernix's representatives, principals, predecessors, executors, executrixes, employees, shareholders, attorneys, officers, directors, independent contractors, consultants, contractors, vendors, any party responsible for sending the facsimiles and all third parties (the "Releasees") from any and all claims, actions, liabilities, debts and potential causes of action whatsoever, however incurred or arising, now existing or hereafter arising, known or unknown, actually

---

[2] The suit was removed to the District Court on April 8, 2015. At some point, the District Court was apprised of the Debtor's bankruptcy proceeding and, consequently, the action has been stayed pending a disposition of the matters before this Court.

[3] On April 9, 2015, the Debtor filed a Motion for Class Certification in the District Court in an attempt to identify potential class members and to prevent pre-certification settlement offers. That motion, however, was later voluntarily withdrawn. The Debtor testified at hearing on March 15, 2016 that there are not yet any known putative class members.

[4] The Debtor has subsequently amended his Schedule C on numerous occasions. The most recent version, which was filed October 6, 2015, includes the Pernix cause of action. However, it also includes claimed exemptions in four (4) other TCPA claims against various other defendants including St. Lukes, H &H Wholesale, Novasom, and Kaberline. *See* Doc. #72.

brought or that could have been brought, relating to or pertaining to the TCPA Case.

*See Application to Compromise Controversy and Settlement Agreement,* p.6, ¶ 3-4 (Doc. #66). Pursuant to the agreement, the Trustee requests in his Application that upon payment of the settlement amount, the Debtor be ordered to dismiss the Pernix litigation with prejudice. Alternatively, the Trustee asks that he be authorized to dismiss the action on the Debtor's behalf if the Debtor fails to do so.

The Application and proposed settlement were served on all creditors and parties in interest. The only objection was raised by the Debtor, who asserts that the proposed settlement amount grossly exceeds the value of the claim. He contends that the cause of action is worth no more than $500, is fully exempt and, therefore, should be abandoned by the Trustee. Specifically, the Debtor alleges that Pernix's settlement offer constitutes an impermissible attempt to "buy off" the Debtor in the TCPA litigation and should not be approved by this Court. *See Debtor's Objection to Application to Compromise Controversy and Suggestions in Support Thereof*, pp, 3-4, 8 (Doc. #73). In reply, the Trustee requests that these objections be overruled as the Debtor lacks standing to challenge the proposed settlement.

## DISCUSSION

Upon the filing of a bankruptcy petition, an estate is created that is comprised of, among other things, "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). These "legal and equitable interests" include any causes of action that belonged to the debtor at the time that the bankruptcy case was filed. *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004); *In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir. 1987). Accordingly, "a trustee, as the representative of the bankruptcy estate, is the proper party in interest and is the only party in interest to prosecute

3

causes of action belonging to the estate." *Parker*, 365 F.3d at 1272. *See also Matter of New Era, Inc.,* 135 F.3d 1206, 1209 (7th Cir. 1998) ("When a debtor has a trustee in bankruptcy . . . the trustee has, with immaterial exceptions, the exclusive right to represent the debtor in court."); *In re Seven Seas Petroleum*, 522 F.3d 575, 584 (5th Cir. 2008) ("If a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it."). This right of representation by the Trustee extends to any interest that the debtor may have in class action litigation. *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 375 B.R. 719, 725 (S.D.N.Y 2007). *See also Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) (upon filing Chapter 7 petition, portion of debtor's uncertified class action claim "fell into the estate in bankruptcy").

Because the cause of action belongs to the Trustee, a Chapter 7 debtor only has standing to challenge a proposed settlement of the claim under limited circumstances. The question of whether a party has standing is a threshold inquiry in every federal case. *In re Thomas*, 469 B.R. 915 (10th Cir. 2012). The doctrine of standing limits federal court authority by requiring the courts to satisfy themselves that a plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction'" *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1149, 173 L. Ed. 2d 1 (2009) (*quoting Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)). Standing inquiries invoke both constitutional and prudential considerations. *Warth,* 422 U.S. at 500.

Constitutional standing stems from the "case or controversy" requirement of Article III of the Constitution. A plaintiff has Article III standing if and only if

> it has suffered an 'injury in fact,' which is 'fairly traceable' to the challenged action of the defendant, and which would 'likely' be redressed by a favorable decision. Standing is lacking if it is merely 'speculative'—as opposed to 'likely'—that the plaintiff's injury would be redressed by a favorable decision.

4

*In re GT Automation Group, Inc.*, -- F.3d --, 2016 WL 3648383 at *2, 62 Bankr. Ct. Dec. 217, (7th Cir. 2016) (internal citations omitted) (*quoting United States v. Windsor*, 133 S. Ct. 2675, 2685-86, 186 L. Ed 2d 808 (2013)). The Debtor asserts that he has Article III standing because if the Court approves the proposed settlement, he will suffer an "injury in fact" in that he will be precluded from acting as the class representative in the TCPA litigation and will be unable to obtain the statutory and injunctive relief provided thereunder. *Debtor's Memorandum on Standing of Debtor to Object to Application to Compromise Controversy* (Doc. #112) at 3.

However, while a federal litigant must certainly possess Article III standing, the doctrine of standing in the bankruptcy context also encompasses prudential limitations. Bankruptcy standing, a form of prudential standing, is narrower than Article III standing. *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir, 1998).[5] *See also Matter of Andreuccetti*. 975 F.2d 413, 416 (7th Cir. 1992). In order to establish bankruptcy standing, "a litigant must qualify as a 'person aggrieved' by the [bankruptcy] order. A 'person aggrieved' . . . must demonstrate that the order diminishes the person's property, increases the person's burdens, or impairs the person's rights." *Andreuccetti*, 975 F.2d at 416. In other words,

> [t]o have standing to object to a bankruptcy order, a person must have a *pecuniary interest* in the outcome of the bankruptcy proceedings. . . . Debtors, particularly Chapter 7 debtors, rarely have such a pecuniary interest because no matter how the estate's assets are distributed by the trustee, no assets will revert to the debtor.

\* \* \*

---

[5] In *GT Automation Group*, the Seventh Circuit noted, in dicta, that since its ruling in *Cult Awareness Network*, the Supreme Court has "clarified the meaning of 'prudential standing' and reaffirmed that 'a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.' *GT Automation Group*, 2016 WL 3648383 at *3, n. 1, *quoting Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-88, 188 L. Ed. 3d 392 (2014). Because *GT Automation Group* involved only issues of constitutional standing, the Seventh Circuit declined to discuss whether, in light of *Lexmark*, standing in bankruptcy cases still includes "prudential" considerations." Without express authority to the contrary, this Court concludes that in the bankruptcy context, a party must still have both constitutional and "bankruptcy" standing.

>   There is an established "exception" to the rule that debtors do not have standing to object to bankruptcy orders, which is not so much an exception as a careful application of the pecuniary interest rule itself. Occasionally, a debtor might be able to satisfy all debts with the assets from the estate and be left with some amount remaining. If the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order.

*In re Cult Awareness Network, Inc.*, 151 F.3d at 607-08 (emphasis added). *See also Andreuccetti*, 975 F.2d at 417; *In re Nangle*, 288 B.R. 213, 216 (8th Cir. B.A.P. 2003).

The "pecuniary interest" requirement was adopted in an effort to ensure that bankruptcy cases are processed expeditiously. As the Fourth Circuit explained:

>   Courts consistently have noted a public policy interest in reducing the number of ancillary suits that can be brought in the bankruptcy context so as to advance the swift and efficient administration of the bankrupt's estate. This goal is achieved primarily by narrowly defining who has standing in a bankruptcy proceeding. . . . Courts should be chary about [relaxing the requirements attending bankruptcy standing] . . . as lax rules which liberally allow parties with some interest in the bankruptcy proceeding, such as a Chapter 7 debtor, to contest a proposed course of action, or to appeal an adverse decision, are too likely to generate 'protracted litigation' that ultimately serves neither the debtor's estate nor the creditors. Stricter rules . . . have the salutary effects of advancing the estate's 'timely administration' . . . and shielding the courts from 'the needless multiplication of lawsuits.'

*Richman v. First Woman's Bank (Matter of Richman)*, 104 F.3d 654, 656-57 (4th Cir. 1997). *See also In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010) (purpose of requiring a bankruptcy party to have a pecuniary interest in the outcome of the case is to prevent unnecessary, protracted litigation).

Here, the Trustee argues that because the Debtor's only interest in the TCPA litigation is the $500 exemption that he has claimed pursuant to 735 ILCS 5/12-1001(b), he has no pecuniary interest in the outcome of the case and, therefore, no standing to challenge the proposed settlement. However, the Trustee's argument is premised on an assumption that the TCPA claim is worth more than the Debtor's claimed exemption. If, as posited by the Debtor on

6

his amended Schedule C, the cause of action is actually worth no more than the claimed exemption, the issue becomes not whether the Debtor has standing to challenge the Trustee's proposed settlement but, rather, whether the Trustee has standing to settle a suit that is not property of the bankruptcy estate. *See In re Ball (Ball I)*, 201 B.R. 204, 208 (Bankr. N.D. Ill. 1996) ("If the full value of the Debtor's interest in the lawsuit has been excluded from the estate by the exemption, the estate has no interest to settle."). Accordingly, it is necessary for the Court to determine the value of the Debtor's interest in the TCPA claim.[6]

In order to assess the value of the cause of action, it is first necessary to have a general understanding of the TCPA and the remedies it provides. The TCPA forbids the use of any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine. 47 U.S.C. § 227(b)(1)(C). It allows a plaintiff to recover the greater of their actual damages or $500 for each violation. 47 U.S.C. § 227(b)(3)(B). These damages may be trebled if the Court determines that the defendant knowingly or willfully violated the Act. 47 U.S.C. § 227(b)(3). In addition, the TCPA also affords the plaintiff the right to injunctive relief. 47 U.S.C. § 227(b)(3)(A).

While the parties agree that the TCPA claim in this case is based on two allegedly unsolicited facsimile transmissions, the parties have vastly disparate assessments of the claim's value. The Trustee has accepted an offer to settle the TCPA litigation for $10,000. In support of his Application to Compromise Controversy, the Trustee submitted the affidavit of Mark Pfeiffer ("Pfeiffer"), bankruptcy counsel for Pernix, in which he explains the basis for the $10,000 settlement figure. In his affidavit, Pfeiffer avers that if the Debtor were successful on his TCPA

---

[6] The Court notes that it is not necessary for it to place an exact value on the Debtor's individual claim. Instead, "[a]ll that is required here is for this Court to ascertain whether the value of the claim exceeds the Debtor's wildcard exemption. If it does, then the estate has an interest in the [l]awsuit, which the Trustee may pursue." *In re Ball (Ball II)*, 201 B.R. 210 (Bankr. N.D. Ill. 1996).

claim, he would recover at least $1,000. *Affidavit of Mark Pfeiffer* at ¶ 31. These damages could be trebled to $3,000 if the Court were to find that the violations were knowing or willful. *Id.* In addition, the original TCPA complaint asserted claims for both conversion and alleged violations of the Missouri Consumer Fraud and Deceptive Business Practices Act. *Id.* at ¶15. While the complaint was subsequently amended to remove these causes of action, Pfeiffer points out that they have not been withdrawn with prejudice by the Debtor and, therefore, are still a source of potential liability for Pernix. *Id.* at ¶ 34. Finally, the TPCA complaint requests that the plaintiff be afforded injunctive relief, which Pfeiffer contends "pose[s] a potentially significant and disruptive risk that is difficult to quantify but certainly exposes Pernix to risk of injury far in excess of the $10,000 settlement payment." *Id*. at ¶ 35

Conversely, the Debtor contends that the value of the claim is substantially lower than $10,000. He maintains that the cause of action has a value of no more than $500. In support of this value, the Debtor offered the testimony of Noah Wood ("Wood"), a TCPA class action attorney. While conceding that the two "junk faxes" in question could have a value of up to $1,500 a piece, Mr. Wood testified that in his experience, it was unlikely for a plaintiff to actually recover such an amount. He assessed the faxes' fair market value to be no more than $250 each.[7]

Further, the Debtor asserts both through his filings and the testimony of Wood that the proposed settlement offer represents an attempt by Pernix to "buy off" the class representative in order to derail the class action litigation. The Debtor is the only named plaintiff in the class action suit and the statute of limitations has expired. Thus, another putative class member cannot be substituted as the class representative. Further, a bankruptcy trustee is, as a general rule, not a

---

[7] Mr. Wood noted that while the TCPA provides that a plaintiff may recover $500 per violation, the amount actually recovered often winds up being much less. Because there is no fee shifting arrangement under the TCPA, large attorney contingency fees often consume much of the recovery.

suitable class representative due to conflict of interest concerns. *Dechert v. Cadle Co.*, 333 F.3d 801 (7th Cir. 2003). Therefore, unless the Court finds that TCPA claim is wholly exempt (*i.e.* has a value of $500 or less), the effect of the Trustee's settlement will be to defeat the class action litigation in its entirety.

The proper analysis for valuing claims was set forth by the Seventh Circuit in *In re Polis*, 217 F.3d 899 (7th Cir. 2000). In that case the debtor, after filing her Chapter 7 petition, learned that she held a possible cause of action under the Truth in Lending Act (TILA) and the Illinois Consumer Protection statute against Getaways, a travel service provider. The debtor claimed a $900 exemption in the cause of action and valued it at $0. In addition to claiming an exemption in the TILA claim, the debtor filed a class action lawsuit against Getaways in which she was the first and only named plaintiff.

The day after the class action complaint was filed, the debtor received a discharge and one week later, her case was closed. Shortly thereafter both the trustee and Getaways moved to reopen the case, asserting that the cause of action was worth more than $900 and, therefore, had been improperly exempted.

The *Polis* Court began its discussion by noting that pursuant to § 522(a)(2) of the Bankruptcy Code, the term "value" for exemption purposes means "fair market value" of the property sought to be exempted "*on the date the petition for bankruptcy was filed*, unless the debtor's estate acquires the property later." *Id.* at 902, *citing* 11 U.S.C. § 522(a)(2). According to the Court, the "fair market value" of a legal claim is determined by multiplying the amount of the judgment that the plaintiff would recover if he litigated and won by the probability of prevailing. *Id.* at 902. When valuing such a claim in advance, it is necessary to "adjust for the uncertainty that its potential value will be realized." *Id.* at 903. The Court explained:

> When there is uncertainty about whether some benefit [such as a monetary award in a class action suit]... will actually be received, the *value* of the (uncertain) benefit is less than the *amount* of the benefit if it is received. A *claim* for $X is not worth $X. A 50 percent chance of obtaining a $1,000 judgment is not worth $1,000. As a first approximation, it is worth $500 . . . .

*Id.* at 903. *See also Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (courts must take into account the contingent value of assets when considering their value).

Before starting its analysis, the Court notes that there were evidentiary irregularities in this case that made it difficult to fully evaluate the claim. As indicated above, the Trustee offered the affidavit of Pfeiffer in support of the proposed settlement. Although Pfeiffer was present at the hearing December 2, 2015 and the Trustee initially offered to have him testify in greater detail as to the averments in the affidavit, the Trustee chose to "stand on the affidavit" after Debtor's counsel represented that he had no objection to it.

At a subsequent hearing on March 15, 2016, the Debtor, with leave of Court, offered both his own testimony and that of Wood.[8] It should be noted that on cross examination, counsel for the Trustee did not challenge the values espoused by Wood nor, after hearing Wood's testimony, did he request the opportunity to supplement the Pfeiffer affidavit or elicit additional testimony.[9]

Turning to the evidence in this case, Pfeiffer asserts in his affidavit that *if* the Debtor's TCPA case were successful, the Debtor would recover at least $1,000, which represents the

---

[8] The Court granted the Debtor leave to file additional evidence after a hearing on February 17, 2016. The Court believed that statements made at the December 2, 2015 hearing indicated that the Court would be willing to entertain additional evidence if necessary. The matter was before the Court for hearing on December 2, 2015 on the Debtor's objection to the proposed settlement, albeit not necessarily for an evidentiary hearing. It is the practice of this Court to place a substantial number of matters on an individual docket-- sometimes as many as fifty or sixty at one time. Thus, evidentiary hearings are often then rescheduled for a later hearing date. The Trustee filed the Pfeiffer affidavit two days prior to the scheduled hearing. Although the matter had not been specifically noticed as an evidentiary hearing, the Trustee had Pfeiffer available to testify.

[9] The Court would have entertained such a request due to concerns that the Trustee may have been prejudiced by Debtor's prior acceptance of the affidavit and his subsequent opportunity to put on evidence as to the claim's value.

maximum statutory recovery available for the violations at issue.[10] This figure, however, *assumes* a 100% likelihood of recovery. There was no evidence indicating that Pernix properly considered the Debtor's likelihood of prevailing when valuing the claim. Simply because a statute provides that a litigant *may* recover a certain damage amount does not necessarily mean that he will actually do so.[11]

Likewise, the proposed settlement appears to place great value on Pernix's potential liability for consumer protection violations and treble damages under both state law and the TCPA. Again, however, no evidence was offered to show the likelihood of such exposure. Pfeiffer admits in his affidavit that the claims under the Missouri Consumer Fraud and Deceptive Business Practices Act were voluntarily dismissed on April 17, 2015 and have not been refiled. Affidavit at ¶¶ 17-18. While admittedly these claims were dismissed without prejudice, no evidence has been put forth to suggest that they will be revived and, if so, whether they will be successful.[12]

Finally, Pfeiffer states in his affidavit that the proposed settlement includes a release of the request for injunctive relief in the TCPA case. Specifically, he states that "[t]he threat of injunctive relief pose[s] a potentially significant and disruptive risk that is difficult to quantify but certainly exposes Pernix to risk of injury far in excess of the $10,000 settlement payment." Affidavit at ¶ 35. The Court does not find this averment credible. There is no explanation as to

---

[10] This is the maximum statutory recovery for two TCPA violations. This figure, however, can be trebled for willful or knowing violations.

[11] The Court understands the quandary or trick box that Pernix and the Trustee are in with regard to the value of the claim. On the one hand, the Trustee, for purposes of this litigation, needs to show that the claim has significant value. On the other hand, if Pernix states, other than hypothetically, that the claim has a greater value or that the Debtor has a substantial probability of success in the underlying action, it could be deemed an admission in subsequent proceedings.

[12] The Court notes that the Debtor did not list these state court causes of action on his Amended Schedule B. He lists only a "[c]laim for damages under the Telephone Consumer Protection Act, 42 U.S.C. § 227 due to sending unsolicited faxes. . . ." As a result, the Debtor may be judicially estopped by the District Court from proceeding on the state court claims.

how the avoidance of an injunction *as to this individual Debtor* could possibly have a value in excess of $10,000.[13] As noted in the Debtor's *Sur-Reply to the Application to Compromise Controversy*, injunctive relief as to the Debtor individually would simply involve the issuance of a court order directing Pernix to cease sending any faxes in contravention of the TCPA to *him*. *Sur-Reply to the Application to Compromise Controversy* (Doc. #96) at 6. The Court can fathom no set of circumstances in which such an order would be worth more than $10,000 outside the context of a class action lawsuit.

Conversely, Wood, an attorney with extensive TCPA litigation experience, testified that the $250 per facsimile value ascribed by the Debtor was reasonable in the context of individual TCPA claims**.**[14] While acknowledging that the facsimiles *could* be worth as much as $1,500 apiece, Wood testified that assigning a claim its maximum possible recovery-- before proceeding with the case-- was not a fair approximation of its worth. This is because *the plaintiff is not guaranteed a win* in any litigation. The witness cited several reasons—such as an "uncollectable defendant" or the availability of a defense—as to why a litigant might be unsuccessful. In addition, Wood testified that other "valuable" concerns raised by Pernix were unlikely to occur. For instance, Wood's assertion that treble damages are rarely awarded in individual TCPA cases was uncontroverted. The Debtor's value takes into account the probability that he will prevail on his claim and the likelihood that he will recover certain damages. The Trustee's does not. The Court believes that the methodology employed by the Debtor is consistent with the Seventh Circuit's directives in *Polis* and provides a more accurate reflection of the claim's actual worth.

---

[13] On the date that the Debtor filed his bankruptcy petition, he had not yet filed a class action suit against Pernix. All he had at that time was an individual cause of action for two unsolicited faxes under the TCPA. Hence, the relevant values are of that individual claim.

[14] The witness actually testified that the Debtor's value was quite generous. In his opinion, the faxes in this case could have a value of as little of $10 to $15 apiece.

Hence, based on the evidence presented, the Court cannot find that the value of the TCPA claim in this case exceeds the $500 exemption claimed by the Debtor.

Further, the Court has serious concerns that the settlement offer in this case is merely an attempt to decapitate the putative class and thwart the class action litigation. On its face, the settlement agreement purports to settle only the estate's claims against Pernix and not those of any putative class members, to the extent that they exist. However, the practical effect of the settlement is actually dismissal of the class action suit in its entirety. The Debtor is, at present, the sole class member. If his claim is dismissed, there is no other class representative to step into his shoes and, because the statute of limitations has expired, the action cannot subsequently be refiled by another putative class member.

It is well established that a class action defendant cannot "buy off" a class representative where a motion for class certification has been made but not ruled upon. "Otherwise, the defendant could delay the action indefinitely by paying off each class representative in succession." *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003). *See also Alpern v. UtiliCorp. United, Inc.*, 84, F.3d 1525, 1539 (8th Cir. 1996) (defendant cannot "buy off" class representatives until class certification has been "properly denied" on the merits in order to "protect[ ] a class representative's responsibilities to putative class members from being terminated by a defendant's attempts to pay off the representative's claims"). As the Seventh Circuit recently stated in *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015), in class action cases "[s]ettlement proposals designed to decapitate the class upset the incentive structure of the litigation by separating the representative's interests from those of other class members." *Id.*

Because of these concerns, settlement offers related to class action claims must be carefully scrutinized. For instance, in *Polis*, the Court explained that while a rejected settlement offer is normally good evidence of a claim's minimum value, this is often not the case in the context of class action litigation. It observed:

> Since [the debtor] was the only named plaintiff, since the statute of limitations was running (has in fact now run), and since the trustee in bankruptcy apparently had no interest in pursuing the claim against Getaways (another reason to doubt the claim has much value), Getaways had a chance to kill the class action either by settling with Polis before the class was certified, or simply by convincing the court that the claim should not be exempted and would therefore revert to the trustee. In other words, for $1,500 Getaways may have been trying to buy not only Polis's claim but, also, in effect, the claims of all the other members of the class as well-"in effect" because Getaways was not offering *them* anything and because the offer might kill the class action even if Polis rejected it.

*Id.* at 904.

In the instant case, the Debtor is the only named plaintiff and the statute of limitations has expired. By offering to settle the estate's claim for $10,000, which is over three times more than the highest possible recovery under the relevant sections of the TCPA and *twenty times* the value supported by the evidence, the Court can only conclude that Pernix is attempting to "buy off" not only the estate's claim but those of all of the other putative class members as well. This attempt to derail the class action cannot be permitted.

Because the Court finds that the Debtor's whole interest in the TCPA claim has been exempted, it is excluded from the bankruptcy estate and beyond the reach of the Trustee.[15] The Trustee has no standing to settle a claim that is not property of the estate and, accordingly, the Trustee's Application to Compromise must be denied.[16]

---

[15] The Court notes, however, that the Debtor filed the class action lawsuit *before* his claim was exempted and removed from the bankruptcy estate. Therefore, at the time that the action was filed, the claim belonged to the Trustee and the estate, not the Debtor. Although certainly beyond the purview of this Court, this could raise an issue as to whether the District Court has jurisdiction over the Pernix suit.

[16] In his objection, Debtor also requested that the Trustee be ordered to abandon the Pernix claim pursuant to 11 U.S.C § 554(b). The Court makes no ruling on this request in this opinion. This Court has previously held that all

SEE WRITTEN ORDER

ENTERED: September 15, 2016

                                        /s/ Laura K. Grandy
                                    UNITED STATES BANKRUPTCY JUDGE

---

creditors must receive notice of a proposed abandonment. *In re Nordike*, 2013 WL 66262 (Bankr. S.D. Ill. 2013). The Debtor has not filed a separate motion requesting abandonment and his objection to the proposed settlement, in which the request for abandonment was buried, was not served on all creditors.